## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## ANDERSON DIVISION

| | | |
|---|---|---|
| MICHAEL J. FITZGIBBONS, acting on behalf of the Director of the South Carolina Department of Insurance, in his capacity as the Special Deputy Receiver of the SOUTH CAROLINA HEALTH COOPERATIVE, INC., a Multiple Employer Self-Insured Health Plan | ) ) ) ) ) ) ) ) | C.A. NO. |
| PLAINTIFF, | ) ) ) | |
| v. | ) ) | **COMPLAINT** **(JURY TRIAL DEMANDED)** |
| ALTON ATKINSON;  JOHN THOMAS CHILDS, IV;  ATHENA CHILDS; LARRY BUSCH;  MICHAEL CIUFFO; DESHAUN WILLIAMS;  CHERISE RAYMOND;  ANDRE GARCIA LITTLEJOHN;  VICKIE DAMON; KIMBERLY DAVIDSON; WINSTON COOK;   MARK GOODMAN; KRISTIN KETTERMAN; DANIEL WHEELER; REGENT FINANCIAL d/b/a PF HOLDINGS, LLC; KING CAPITAL GROUP; A-Z CONSULTING; INTERMEDIARY NETWORK; BUSCH LAW CENTER; JJLJ FINANCIAL; PROTÉGÉ INVESTMENTS, LLC; IGWT CONSULTING, LLC; COOK BUSINESS SERVICES; and JOHN DOES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| DEFENDANTS. | ) ) ) | |

COMES NOW, Plaintiff Michael J. FitzGibbons, Special Deputy Receiver, on behalf of

the Director of the South Carolina Department of Department of Insurance, the Court-appointed

Receiver for South Carolina Health Cooperative, Inc., by and through his undersigned counsel,

and sets forth this complaint for compensatory, consequential, punitive, and treble damages, as well as costs, attorneys' fees, and pre- and post-judgment interest. The Plaintiff seeks relief from this Court based on Defendants' racketeering activity which was facilitated by means of wire and mail fraud in violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.*, commonly known as Civil RICO. Plaintiff further alleges Defendants are liable to the Plaintiff for conspiracy to violate Civil RICO, fraudulent misrepresentation, civil conspiracy, conversion, unjust enrichment, and violations of the South Carolina Unfair Trade Practices Act. In support thereof, Plaintiff avers the following:

## Jurisdiction

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332. Pursuant to 28 U.S.C. § 1331, the District Court has original jurisdiction over this action because it arises under the federal laws of the United States. The instant case involves violations of 18 U.S.C. §§ 1962 and 1964 of the Civil RICO Act.

2.     Furthermore, this Court has supplemental jurisdiction over the state law claims of fraudulent misrepresentation, civil conspiracy, conversion, unjust enrichment, and violations of the South Carolina Unfair Trade Practices Act pursuant to 28 U.S.C. § 1367(a) because these claims are so related and arise from the same common nucleus of operative fact to the Civil RICO claim, which is within this Court's original jurisdiction, that the claims form part of the same case and controversy under Article III of the United States Constitution. It is clear that judicial economy, as well as convenience and fairness to litigants require the same case to be tried at one time.

3.    As an additional ground, this Court also has jurisdiction pursuant to 28 U.S.C. § 1332, as the diversity of citizenship requirements have been met in this action. South Carolina Health Cooperative, Inc., a Multiple Employer Self-Insured Health plan, (hereinafter referred to as "SCHC") is a corporation organized and existing under the laws of South Carolina, and none of the defendants are incorporated, reside, or have their principal place of business in South Carolina. Furthermore, the total amount in controversy clearly exceeds the sum of seventy-five thousand dollars ($75,000) exclusive of interest and costs, as the fraudulent letters of credit alone amount to $8 million.

4.    This Court has personal jurisdiction over the Defendants under South Carolina's long-arm statute, *South Carolina Code* § 36-2-803, which authorizes personal jurisdiction over a person transacting any business in this State and causing tortious injury in this State by an act or omission outside this State if he regularly derives substantial revenue from services rendered in this State. Defendants, through their racketeering activities, have committed criminal and tortious acts in this state. Therefore, all of the minimum contact requirements of the Due Process Clause of the United States Constitution have been met.

5.    This Court also has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b), (d) and *Federal Rule of Civil Procedure* 4(k)(1)(D). Section 1965(b) of the Civil RICO Act provides that process may be served "in any judicial district of the United States" when required by the "ends of justice." Section 1965(d) allows process to be served "in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Courts have held that such "nationwide service of process" provisions also confer personal jurisdiction over a defendant in any

judicial district as long as the defendant has minimum contacts with the United States. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997).

## Venue

6.      Venue is proper in the Anderson Division of the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b)(2) and (3) because: (1) a substantial part of the events or omissions giving rise to the claim occurred in this district; and (b) because Defendants have significant contacts with this district by conducting business within this district and taking overt acts in furtherance of their scheme to defraud SCHC within this district.

7.      SCHC was headquartered in the City of Seneca, which is completely within the Anderson Division of the United States District Court for the District of South Carolina.

8.      Finally, venue is proper in this federal judicial district in accordance with 18 U.S.C. § 1965(a), which provides for venue in any federal district in which a RICO defendant transacts his affairs. Venue is also proper pursuant to 18 U.S.C. § 1965(b), which permits an action against multiple defendants to proceed in a single district if the ends of justice require it.

## Parties

9.      The Director of the South Carolina Department of Insurance ("Director") is the Court-appointed Rehabilitator for SCHC pursuant to a Consent Order commencing Rehabilitation Proceedings and Granting an Injunction and Automatic Stay of Proceedings (the "Rehabilitation Order") executed on December 22, 2014 by the Honorable L. Casey Manning, Chief Administrative Judge, Fifth Judicial Circuit, Court

of Common Pleas, South Carolina in the case of *Raymond G. Farmer v. South Carolina Health Cooperative, Inc., a Multiple Employer Self-Insured Health Plan*, C/A No.: 2014-CP-40-7340. The Rehabilitation Order also appointed the Plaintiff as Special Deputy Receiver of SCHC.

10. As Rehabilitator of SCHC, the Plaintiff has all powers enumerated in the Rehabilitation Order and others found in Chapter 27 of Title 38 of the *South Carolina Code*.

11. SCHC is a South Carolina corporation, having filed its Articles of Incorporation with the South Carolina Secretary of State on October 16, 2009.

12. The Plaintiff brings the above-captioned action on behalf of SCHC against the Defendants, who were collectively involved in a scheme to defraud, and did defraud, SCHC by knowingly and intentionally entering into fraudulent transactions with SCHC, whereby SCHC received fraudulent Stand-By Letters of Credit ("LOC") in exchange for substantial fees. SCHC paid Two Million ($2,000,000.00) dollars in fees for the LOCs. The fees were not used to secure legitimate LOCs but were thereafter disbursed among the Defendants for their own personal financial gain.

13. Each of the following Defendants (hereinafter collectively referred to as the "RICO Defendants") were directly or indirectly involved and engaged in the fraudulent scheme to defraud SCHC out of millions of dollars for their own personal financial gain:

a. Alton Anthony Atkinson ("Atkinson") is a resident of Toronto, Ontario and at all times relevant herein was a principal and agent of Regent Financial d/b/a PF Holdings, LLC ("Regent Financial") and King Capital Group ("King Capital").

(1) Regent Financial is a limited liability company organized and existing under the laws of the State of Delaware, with a corporate address of 1220 N. Market Street, Suite 806, Wilmington, Delaware, 19801.

(2) According to bank records, Atkinson received $235,730 through Regent Financial as a result of the following transactions from this illicit scheme:

   (a)  Regent Financial received $30,000 from Boddie & Associates' Trust Account on June 12, 2012;

   (b)  Regent Financial received $5,250 from Boddie & Associates' Trust Account on June 14, 2012;

   (c)  Recent Financial received $78,000 from Larry Busch's Trust Account on November 26, 2013; and

   (d)  Regent Financial received $65,000 from JJLJ Financial on May 8, 2013;

   (e)  Regent Financial received a total of $124,980 in June of 2014 from Velocity Partners, LLC's Trust Account;

   (f)  Regent Financial paid JJLJ Financial $30,000 on November 13, 2013 and another $37,500 on June 11, 2014.

(3) King Capital is believed to be a Canadian company with a corporate address at 62 Harwood Ave. S., Suite 4; Ajax, Ontario L1S 2H6.

(4) According to bank records, King Capital received $53,000 from Boddie and Associates' Trust Account on June 5, 2012.

b. John Thomas Childs, IV ("Childs") is a resident of the State of California and at all times relevant herein was a principal and agent of Intermediary-Network.com, Interlink Global Messaging, LLC and A-Z Consulting, LLC.

(1) A-Z Consulting, LLC ("AZ Consulting") is a limited liability company organized and existing under the laws of the State of California.

(2) Upon information and belief, Intermediary-Network.com is a corporation organized and existing in a state other than South Carolina.

(3) Upon information and belief, Interlink Global Messaging, LLC ("IGM") is a limited liability company organized and existing in a state other than South Carolina.

(4) According to bank records, Childs personally and through his various businesses received $301,547 in the following disbursements from this illicit scheme:

(a) A-Z Consulting received $68,700 from Boddie & Associates' Trust Account in 2012;

(b) Intermediary Network received $6,340 from Larry Busch's Trust Account in 2012;

(c) Intermediary Network received $70,838 from Larry Busch's Trust Account in 2013;

(d) A-Z Consulting received $125,847 from Larry Busch's Trust Account in 2013;

(e) Childs received $21,700 from Larry Busch's Trust Account in 2013;

(f)    Childs received $8,122 from the disbursement of the renewal fee in 2014.

c.   Athena Childs ("A. Childs") is a resident of the State of California. According to bank records, A. Childs received $3,300 in 2013 for the fraudulent letters of credit.

d.   Larry Busch ("Busch") is a resident of the State of Arizona and at all times relevant herein was a principal and agent of The Busch Law Center, LLC. Busch acted as the escrow agent for the brokerage fees wired for the 2012 and 2013 wire transfers.

1)    According to bank records, Busch received $2,500 in 2012 for the fraudulent letters of credit.

2)    Upon information and belief, Busch received $50,000 from Safefunds.com in 2014 for the fraudulent letters of credit.

e.   The Busch Law Center, LLC ("The Busch Law Center") is a limited liability company organized and existing under the laws of the State of Arizona and its sole member is a resident of Arizona. The Busch Law Center was the escrow account for the brokerage fees wired for the 2012 and 2013 wire transfers.

f.   Michael Ciuffo ("Ciuffo") is a resident of the State of New York. According to Busch's escrow records, Ciuffo received $49,015 in 2012 for the fraudulent letters of credit.

g.   De'Shaun Williams ("Williams") is a resident of the State of California and at all times relevant herein was a principal and agent of Protégé Investments, LLC.

(1) Protégé Investments, LLC ("Protégé Investments") is a limited liability company organized under the laws of the State of Nevada.

(2) According to bank and Busch escrow records, Williams, personally and through Protégé Investments received $151,229 in the following disbursements for the fraudulent letters of credit:

    (a)   Williams received $46,015.40 from Larry Busch's Trust Account; in 2012;

    (b)   Williams received $62,065.75 from Larry Busch's Trust Account in 2013;

    (c)   Williams received $43,148 from Velocity Partners, LLC's Trust Account in 2014.

h.  Cherise Raymond ("Raymond") is a resident of the State of New Jersey. According to bank records, Raymond received $65,148.10 in the following disbursements for the fraudulent letters of credit:

(1) Raymond received $3,000 in 2012 from Larry Busch's Trust Account;

(2) Raymond received $32,000 in 2013 from Larry Busch's Trust Account;

(3) Raymond received $30,148.10 in 2014 from Velocity Partner, LLC's Trust Account.

i.  Andre Garcia Littlejohn ("A. Littlejohn") is a resident of the State of California and at all times relevant herein was a principal and agent of JJLJ Financial, LLC.

(1) JJLJ Financial, LLC ("JJLJ Financial") is a limited liability company organized and existing under the laws of the State of California.

(2) According to bank records, A. Littlejohn received $641,429.40 through JJLJ Financial in the following transactions for the fraudulent letters of credit:

(a) JJLJ Financial received $105,515.40 from Larry Busch's Trust Account in 2012;

(b) JJLJ Financial received $100,750 from Boddie & Associates' Trust Account in 2012;

(c) JJLJ Financial received $370,625 from Larry Busch's Trust Account in 2013;

(d) JJLJ Financial received $97,039 from Velocity Partners' Trust Account in 2014;

(e) JJLJ Financial received $37,500 and $30,000 from Regent Financial in June 2014 and November 2013, respectively;

(f) JJLJ Financial paid $65,000 to Regent Financial in May 2013;

(g) JJLJ Financial paid $35,000 to Daniel Wheeler in May 2013.

j. Vickie Damon ("Damon") is a resident of the State of California and at all times relevant herein was a principal and agent of IGWT Consulting, LLC.

(1) IGWT Consulting, LLC ("IGWT Consulting") is a limited liability company organized and existing under the laws of the State of Nevada.

(2) According to Boddie and Associates' bank records, Damon received $80,000 through IGWT Consulting in 2012 for the fraudulent letters of credit.

k. Upon information and belief, Kimberly Davidson ("Davidson") is a resident of a State other than South Carolina. According to Busch's escrow records, Davidson received $5,700 in 2012 for the fraudulent letters of credit.

l. Winston Cook ("Cook") is a resident of the State of Georgia and at all times relevant herein was a principal and agent of Cook Business Services, LLC.

(1) Cook Business Services, LLC ("Cook Business Services") is a limited liability company organized and existing under the laws of the State of Georgia.

(2) According to Busch's escrow records, Cook received $13,400 through Cook Business Services in 2013 for the fraudulent letters of credit.

m. Mark Goodman ("Goodman") is resident of the State of Florida and was at all time relevant herein a principal of Cooperative Solutions for America ("CSA"), which provided day-to-day management services to SCHC.

n. Kristin Ketterman ("Ketterman") is a resident of State of California. According to bank records, Ketterman received $92,570.90 in 2014 for the fraudulent letters of credit.

o. Upon information and belief, Daniel Wheeler ("Wheeler") is a resident of a State other than South Carolina. According to bank records, Wheeler received $35,000 from JJLJ Financial in 2013 for the fraudulent letters of credit.

**<u>Facts Common to All Causes of Action</u>**

14.    A Multiple Employer Welfare Arrangement ("MEWA") is an insurance arrangement whereby a group of member employers pool contributions to provide health, dental, and short term disability benefits to their employees.

15.    The South Carolina General Assembly enacted S.C. Code Ann. §§ 38-41-10, *et seq.* to allow for the creation, operation, and regulation of MEWAs in South Carolina. The MEWA member employers essentially bear their own risk, so MEWA policies are statutorily prohibited from receiving guaranty fund protection. *See* S.C. Code Ann. § 38-29-40.

16.     Because MEWAs do not have guaranty fund protection, the SCDOI imposed certain financial requirements upon SCHC before it could begin its operations. One of the principal conditions in SCHC's June 15, 2012 licensing order was that it must fund and maintain a loss reserve and surplus account in an amount sufficient to satisfy the SCDOI under § 38-41-70 of the *South Carolina Code*. The initial (base) amount was set at $5 million.

17.     In order for SCHC to meet the higher financial requirements, the SCDOI permitted SCHC to fund its loss reserves with an Irrevocable Stand-By Letter of Credit ("LOC") from a bank chartered by this state or a member bank of the Federal Reserve System with a branch office in this state or otherwise approved by the director or his designee.

18.     The LOC was to serve as a last resort resource to pay claims in the event SCHC's liabilities exceeded its assets and SCHC was declared insolvent.

19.     In late 2011, Goodman, a principal and initial investor in CSA, advised Cooper Littlejohn, then-CEO of SCHC, to obtain a commercial LOC through IGM and its affiliate, Protégé Investments. Goodman placed Cooper Littlejohn in contact with Ciuffo, who thereafter negotiated the sale of the first fraudulent LOC ("LOC #1") to SCHC, ostensibly from Bank of America. A copy of the emails evidencing this negotiation are attached hereto as Exhibit 1 and incorporated herein.

20.     On or about May 1, 2012, Cooper Littlejohn entered into a Finder Fee Agreement with IGM, an affiliate of Protégé Investments, committing SCHC to pay $600,000 for IGM's assistance in obtaining a $5 Million (5,000,000.00) Dollar LOC. A

copy of the Finder Fee Agreement is attached hereto as <u>Exhibit 2</u> and incorporated herein.

21.     In an email dated May 31, 2012, the day before the initial LOC transaction was completed, Goodman's principal financial advisor warned Goodman that, given the parties and individuals involved, the LOC transaction "was most likely fraudulent" and advised him not to proceed with it. Goodman promptly disregarded the warning and pushed the transaction through. A copy of this email is attached hereto as <u>Exhibit 3</u> and incorporated herein.

22.     On or about June 2, 2012, SCHC wired $600,000 in brokerage fees to IGM's closing agent, The Busch Law Center.  The Busch Law Center disbursed those fees to the Defendants as set forth below:

    a.     $275,000 disbursed to Boddie & Associates' Trust Account on June 4, 2012. Boddie & Associates' Trust Account retained $6,000, and thereafter disbursed the remaining fees to the Defendants as set forth below:

        (1)     $100,750 to JJLJ Financial on June 5, 2012;

        (2)     $53,000 to King Capital on June 5, 2012;

        (3)     $80,000 to IGWT Consulting on June 5, 2012;

        (4)     $30,000 to Regent Financial on July 12, 2012.

    b.     $105,515.40 disbursed to JJLJ Financial on June 4, 2012;

    c.     $49,015.40 disbursed to Ciuffo on June 4, 2012;

    d.     $46,015.40 disbursed to Williams on June 4, 2012;

    e.     $3,000 disbursed to Raymond on June 4, 2012;

    f.     $1,000 disbursed to A. Childs on June 5, 2012;

g.     $20,000 disbursed to Zion Trust on June 5, 2012;

h.     $4,515.40 disbursed to Sharon Colker on June 5, 2012;

i.     $6,340.40 disbursed to Intermediary Network on June 5, 2012;

j.     $10,000 disbursed to A-Z Consulting on June 11, 2012;

k.     $5,250 disbursed to Regent Financial on June 14, 2014;

l.     $5,700 disbursed to Davidson on July 23, 2012;

m.     $20,000 disbursed to A-Z Consulting on July 23, 2012;

n.     $1,000 disbursed to A. Childs on August 2, 2012;

o.     $10,000 disbursed to A-Z Consulting on August 23, 2012;

p.     $28,700 disbursed to A-Z Consulting on September 4, 2012; and

q.     $1,300 disbursed to A. Childs on September 4, 2012.

A copy of the Busch's escrow records and bank statements evidencing these wire transfers are attached hereto as <u>Exhibit 4</u> and incorporated herein.

23.     After receiving SCHC's funds, Protégé Investments sent LOC No. 1 to SCHC via US Mail. SCHC gave the original LOC to the South Carolina Department of Insurance ("SCDOI") for safekeeping. A copy of LOC No. 1 is attached hereto as <u>Exhibit 5</u> and incorporated herein.

24.     Letters of credit must be renewed annually. On April 5, 2013, in a series of emails, Williams represented to Cooper Littlejohn, then-CEO of SCHC, that Protégé Investments would renew LOC No. 1 for SCHC at the cost of $525,000, a 10.5 percent broker fee, despite actual knowledge LOC No. 1 was fraudulent. A copy of the emails evidencing these negotiations are attached hereto as <u>Exhibit 6</u> and incorporated herein.

25. To complete this transaction, SCHC wired the fees to The Busch Law Firm, IGM's closing agent, which again disbursed the fees to the Defendants as set forth below:

    a. $279,825 disbursed to JJLJ Financial on May 8, 2013. JJLJ Financial thereafter disbursed the fees to the Defendants as set forth below:

        (1) $65,000 to Regent Financial, at the direction of Atkinson, on May 8, 2013;

        (2) $35,000 to Wheeler, at the direction of Atkinson, on May 8, 2013;

    b. $15,000 disbursed to Raymond on May 8, 2013;

    c. $50,000 disbursed to Safefunds.com on May 8, 2013;

    d. $13,565.75 disbursed to Williams on May 8, 2013;

    e. $29,925 disbursed to Zion Trust on May 7, 2013; and

    f. $125,847.25 disbursed to A-Z Consulting on May 7, 2013.

A copy of Busch's escrow records and bank statements evidencing these wire transfers are attached hereto as Exhibit 7 and incorporated herein.

26. After receiving SCHC's funds, Protégé Investments sent a renewal of LOC No. 1 to SCHC via US Mail. A copy of the renewal of LOC No. 1 is attached hereto as Exhibit 8 and incorporated herein.

27. By mid-2013, the SCDOI determined SCHC's loss reserve account should be increased by $3 million. On July 31, 2013, in a series of emails between Williams and Cooper Littlejohn, Williams represented Protégé Investments would provide a second fraudulent LOC ("LOC No. 2") for SCHC in exchange for $350,000, despite actual

knowledge LOC No. 2 was fraudulent. A copy of the emails evidencing this negotiation are attached hereto as Exhibit 9 and incorporated herein.

28.    On or about November 25, 2013, SCHC wired a $350,000 (11.6 percent) brokerage fee to The Busch Law Center. The Busch Law Center again disbursed the fees to the Defendants as set forth below:

a.    $2,500 disbursed to Williams on November 26, 2013;

b.    $2,500 disbursed to Raymond on November 26, 2013;

c.    $46,000 disbursed to Williams on November 26, 2013;

d.    $14,500 disbursed to Raymond on November 26, 2013;

e.    $78,000 disbursed to Regent Financial on November 26, 2013;

f.    $6,700 disbursed to Cook Business Services on December 3, 2013;

g.    $90,800 disbursed to JJLJ Financial on December 4, 2013;

h.    $500 disbursed to The Busch Law Center on December 6, 2013;

i.    $2,000 disbursed to The Busch Law Center on December 6, 2013;

j.    $21,700 disbursed to Childs on December 4, 2013;

k.    $6,700 disbursed to Cook Business Services on December 3, 2013; and

l.    $70,838 disbursed to Intermediary Network on December 4, 2013.

A copy of the Busch's escrow records and bank statements evidencing these wire transfers are attached hereto as Exhibit 10 and incorporated herein.

29.    After receiving SCHC's funds, Protégé Investments sent LOC No. 2 to SCHC via US Mail. A copy of LOC No. 2 is attached hereto as Exhibit 11 and incorporated herein.

30.     The following year, around June of 2014, Williams again represented to SCHC that Protégé Investments would renew LOC No. 1 for $525,000 in brokerage fees, despite actual knowledge LOC No. 1 was fraudulent. A copy of the emails evidencing this negotiation are attached hereto as Exhibit 12 and incorporated herein.

31.     To obtain the renewal, SCHC wired $525,000 in fees to Velocity Partners, LLC. Velocity Partners disbursed the fees to the Defendants as set forth below:

a.     $15,000 to Regent Financial on June 2, 2014;

b.     $16,244 to Paragon Venture Group on June 2, 2014;

c.     $2,706.50 to Raymond on June 3, 2014;

d.     $2,706.50 to Williams on June 3, 2014;

e.     $11,250 to Regent Financial on June 10, 2014;

f.     $195,141.80 to Paragon Venture Group on June 10, 2014. Paragon Venture Group, through its principal Tim Carr, thereafter disbursed the fees to the Defendants as set forth below:

    1)     $92,570.90 to Ketterman on June 10, 2014;

    2)     $8,122 to Childs at some point in 2014.

g.     $98,730 to Regent Financial on June 10, 2014. Regent Financial thereafter disbursed $37,500 to JJLJ Financial;

h.     $27,441.60 to Raymond on June 10, 2014;

i.     $97,039 to JJLJ Financial on June 10, 2014; and

j.     $40,441.60 to Williams on June 10, 2014.

A copy of the bank statements evidencing these wire transfers are attached hereto as Exhibit 13 and incorporated herein.

32.    After receiving SCHC's funds, Protégé Investments sent a renewal of LOC No. 1 to SCHC via US Mail. A copy of the renewal of LOC No. 1 is attached hereto as Exhibit 14 and incorporated herein.

33.    LOC No. 2 was due for renewal on November 20, 2014. However, on October 24, 2014, the Alabama Securities Commissioner sent an advisory warning to Chiles Stifle, then-CFO of SCHC, about a fraud case being pursued against many of the above-named Defendants. Stifle forwarded the warning to SCHC's then-President David Black on Saturday, October 25, and Black in turn sent it to SCDOI Deputy Director Lee Hill.

34.    On Monday, October 27, 2014, the SCDOI informally confirmed both LOC No. 1 and LOC No. 2 were fraudulent. This fact was formally confirmed by Bank of American via letter on November 10, 2014, a copy of which is attached hereto as Exhibit 15 and incorporated herein.

35.    SCHC was placed into rehabilitation by the Richland County Court of Common Pleas on December 23, 2014, and Michael J. Fitzgibbons was appointed as the Special Deputy Receiver. On the last day of coverage, the Receiver determined SCHC's plan had an unpaid liability of $11.379 million.

**FOR A FIRST CAUSE OF ACTION**
**(Civil RICO against all Defendants)**

36.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

37.    The Civil RICO claims discussed herein are governed by 18 U.S.C. § 1962 (a)–(d) and 18 U.S.C. § 1964. Defendants, through a pattern of racketeering, have

committed the underlying predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

## The RICO Enterprise

38.     Each of the RICO Defendants constitute a group of persons associated together for the common purpose of engaging in an illicit scheme to defraud SCHC, as part of an ongoing organization, with various associates functioning as a continuing unit ("The RICO Enterprise").

39.     The RICO Defendants organized their operation into a group with specific and assigned responsibilities and structure and have continuously and effectively carried out their purpose of theft and diversion of funds from SCHC through an illicit scheme, whereby the RICO Defendants negotiated the sale of fraudulent LOCs in exchange for significant fees.

40.     Defendant Goodman advised Cooper Littlejohn to obtain LOCs from IGM and its affiliate, Protégé Investments, and introduced him to Ciuffo. Ciuffo intentionally misrepresented the validity of the LOCs to Cooper Littlejohn and knowingly deceived SCHC into paying considerable fees to be disbursed among the RICO Defendants.

41.     Thereafter, Williams corresponded with Cooper Littlejohn on numerous occasions to negotiate the annual renewal of LOC No. 1 and the sale of LOC No. 2. The funds from the sale of the fraudulent LOCs were disbursed among the other RICO Defendants, as set forth herein.

## The Patterns of Racketeering Activity

42.     The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the RICO Enterprise's affairs through a pattern

of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(a)–(c), including but not limited to:

a. The RICO Defendants engineered a scheme to defraud SCHC by representing IGM and its affiliate, Protégé Investments, would provide LOCs in exchange for considerable fees;

b. In furtherance of their scheme, by means of wire and mail fraud in interstate or foreign commerce, including but not limited to, negotiating the fraudulent transactions via email, the transmittal of payments through the wires to various accounts, and the transmittal of the fraudulent LOCs via US Mail, as set forth herein, the RICO Defendants knowingly deceived SCHC into paying considerable fees to be disbursed among the RICO Defendants for their own personal gain;

c. The RICO Defendants participated in the scheme and knowingly, willfully, and with the specific intent to deceive and/or defraud SCHC out of millions of dollars for their own personal gain;

d. The pattern of racketeering activity, which began as early as 2011 and continued through 2014, poses a special threat to the public and will continue without judicial intervention;

e. The predicate acts discussed herein represent related criminal conduct, which has a high probability of continuing as several of the defendants have been sued or indicted in similar schemes in other states, including but not limited to, New York, California, Arizona, and Alabama.

**Predicate Acts: Wire and Mail Fraud**

43.    Each RICO Defendant knowingly participated, directly or indirectly, in the conduct of the racketeering enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of 18 U.S.C. §§ 1341 and 1343, involving the use of mail and wire communications in connection with a scheme to defraud. Each of the illegal acts was conducted using interstate mail and/or wires and thus affected interstate commerce and/or foreign commerce.

44.    The underlying predicate acts of mail fraud are clearly evidenced every time the Defendants negotiated with SCHC by telephone, email, and U.S. Mail to carry out its scheme to defraud SCHC out of millions of dollars in exchange for fraudulent LOCs.

45.    18 U.S.C. § 1961(1)(B) defines "racketeering activity" as "any act which is indictable under any of the following provisions," including but not limited to, 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

46.    The RICO Defendants committed "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) in that they violated 18 U.S.C. § 1341 by the use of interstate mailings through sending or causing to be sent, the fraudulent LOCs to SCHC.

47.    18 U.S.C. § 1341, commonly known as the mail fraud statute, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever, to be sent or delivered by any private or commercial interstate carrier, or takes or

received therefrom, any such matter or thing, or knowingly causes to be directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

48. The underlying predicate acts of mail fraud are clearly evidenced by the following transactions:

a. After receiving the funds from SCHC, in June of 2012, Protégé Investments sent LOC No. 1 to SCHC via US Mail. *See* <u>Exhibit 5</u>.

b. After receiving the funds from SCHC, in April of 2013, Protégé Investments sent a renewal of LOC No. 1 to SCHC via US Mail. *See* <u>Exhibit 8</u>.

c. After receiving the funds from SCHC, in November of 2013, Protégé Investments sent LOC No. 2 to SCHC via US Mail. *See* <u>Exhibit 11</u>.

d. After receiving the funds from SCHC, in June 2014, Protégé Investments sent a renewal of LOC No. 1 to SCHC via US Mail. *See* <u>Exhibit 14</u>.

49. 18 U.S.C. § 1343, commonly known as the wire fraud statute, provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

50. The RICO Defendants committed "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) in that they violated 18 U.S.C. § 1343 by the use of interstate wires through sending or causing to be sent, numerous emails and phone calls relating to the negotiation and sale of the fraudulent LOCs, as well as the transfer of considerable fees from SCHC to various escrow accounts, which were thereafter disbursed to the RICO Defendants, as set forth herein.

51.     The underlying predicate acts of wire fraud are clearly evidenced by the following wire transfers:

a.  In 2012, SCHC wired $600,000 in brokerage fees to The Busch Law Center in exchange for LOC No. 1. Those funds were thereafter wired to the various defendants for their own personal financial gain. *See* <u>Exhibit 4</u>.

b.  In 2013, SCHC wired $525,000 in brokerage fees to The Busch Law Center to obtain renewal of LOC No. 1. Those funds were thereafter wired to the various defendants for their own personal financial gain.  *See* <u>Exhibit 7</u>.

c.  In 2013, SCHC wired $350,000 in brokerage fees to The Busch Law Center to obtain LOC No. 2. Those funds were thereafter wired to the various defendants for their own personal financial gain. *See* <u>Exhibit 10</u>.

d.  In 2014, SCHC wired $525,000 in brokerage fees to Velocity Partners, LLC to obtain renewal of LOC No. 1. Those funds were thereafter wired to the various defendants for their own personal financial gain. *See* <u>Exhibit 13</u>.

52.     The underlying predicate acts of wire fraud are also clearly evidenced by the following emails:

a.  In late 2011, Goodman placed Littlejohn in contact with Ciuffo, who thereafter negotiated the sale of LOC No. 1 via email, despite actual knowledge LOC No. 1 was fraudulent. *See* <u>Exhibit 1</u>.

b.  On April 5, 2013, in a series of emails, Williams represented to Cooper Littlejohn that Protégé Investments would renew LOC No. 1 for SCHC for $525,000, despite actual knowledge LOC No. 1 was fraudulent. *See* <u>Exhibit 6</u>.

    c.   On July 31, 2013, in a series of emails between Williams and Cooper Littlejohn, Williams represented Protégé Investments would provide a second LOC ("LOC No. 2") for SCHC in exchange for $350,000, despite actual knowledge LOC No. 2 was fraudulent. *See* Exhibit 9.

    d.   On or about June 9, 2014, in a series of emails between Williams and Cooper Littlejohn, Williams represented Protégé Investments would renew LOC No. 1 for SCHC for $525,000, despite actual knowledge LOC No. 1 was fraudulent. *See* Exhibit 12.

53.    Defendants knowingly and intentionally committed wire and mail fraud by misrepresenting and deceiving SCHC into believing it was participating in legitimate business transactions. Defendants' consistent use of mails and wires to carry out its illicit scheme displays its specific intent to defraud by wire and mail.

54.    The RICO Defendants engaged in multiple, repeated, and continuous acts of mail and interstate wire fraud that constituted a "pattern of racketeering." RICO Defendants would have continued their scheme and conspiracy indefinitely unless discovered by Plaintiff.

55.    Defendants' racketeering activities derived significant income from the implementation of the predicate acts of mail and wire fraud. These predicate acts represent related criminal conduct, which will go unpunished unless this Court grants immediate relief.

56.    SCHC reasonably and justifiably relied upon the Defendants' intentional misrepresentations. But for their misrepresentations regarding the validity of the LOCs, SCHC would not have paid millions of dollars in fees to the defendants.

57.     As a direct and proximate result of the RICO Defendants' pattern of racketeering activities in violation of 18 U.S.C. §§ 1962 (a)–(c) by 18 U.S.C. § 1341 (mail fraud) and § 1343 (interstate wire fraud), SCHC, the SCDOI, and the citizens of the State of South Carolina have suffered substantial injuries and damages.

58.     SCHC is entitled to actual and consequential damages in an amount in excess of Fifteen Million Dollars ($15,000,000), which damages should be trebled pursuant to 18 U.S.C. § 1964 and is entitled to costs and attorneys' fees incurred in bringing this action.

## FOR A SECOND CAUSE OF ACTION
### (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d) against All Defendants)

59.     Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

60.     From as early as 2011 through 2014, the RICO Defendants unlawfully, knowingly, and willfully combined, conspired and agreed together and with others to violate 18 U.S.C. § 1962 (a)–(c) as described above, in violation of 18 U.S.C. § 1962(d).

61.     The RICO Defendants knew they were engaged in a conspiracy to commit the predicate acts as part of the racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a)–(c), in violation of 18 U.S.C. § 1962(d).

62.     Each RICO Defendant knew about and agreed to facilitate the RICO Enterprise's scheme to defraud SCHC through the sale of fraudulent LOCs. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a

pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering set forth above.

63.     As a direct and proximate result of the RICO Defendants' conspiracy and the corresponding racketeering activity, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), SCHC, the SCDOI, and the citizens of the State of South Carolina have suffered substantial injuries and damages.

64.     SCHC is entitled to actual and consequential damages in an amount in excess of Fifteen Million Dollars ($15,000,000), which damages should be trebled pursuant to 18 U.S.C. § 1964 and is entitled to costs and attorneys' fees incurred in bringing this action.

## FOR A THIRD CAUSE OF ACTION
### (Fraudulent Misrepresentation against Defendants Michael Ciuffo and De'Shaun Williams)

65.     Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

66.     During the course of conduct described herein, Defendants Ciuffo and Williams falsely represented to SCHC that IGM and its affiliate, Protégé Investments, would provide legitimate LOCs in exchange for considerable brokerage fees. Their representations were nothing but a sham to further the scheme to defraud SCHC out of millions of dollars for their own, and the other RICO defendants, personal financial gain.

67.     Defendants knew their representations were false and said representations were material to SCHC's decision to enter into business transactions with IGM and Protégé Investment. Simply put, SCHC would not have agreed to pay millions of dollars in brokerage fees had it known the LOCs were fraudulent.

68. Defendants made these representations in total disregard of their truth or falsity and with the specific intent SCHC rely and act upon said representations.

69. SCHC relied on the representations made by the Defendants.

70. As a direct and proximate result of Defendants' fraudulent conduct, SCHC suffered substantial injuries and damages. As a result of the foregoing, the Defendants are jointly and severally liable to the Plaintiff for actual damages in an amount to be determined at trial, as well as punitive damages, costs, pre and post-judgment interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

## FOR A FOURTH CAUSE OF ACTION
### (Civil Conspiracy against All Defendants)

71. Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

72. Between 2011 and 2014, Defendants agreed to take concerted actions to achieve its conspiratorial objective to defraud SCHC out of millions of dollars in brokerage fees in exchange for fraudulent LOCs.

73. Defendants collectively had an agreement and understanding with regard to these objectives and the manner in which they were to be achieved.

74. Defendants engaged in these and other acts and joined the conspiracy so they could receive payment in the form of illicit funds from the fraudulent transactions. Defendants concealed the conspiracy from the Plaintiff, financial institutions, the public, and law enforcement, and otherwise avoided any public disclosure of the conspiracy.

75.    SCHC relied on the misrepresentations of co-conspirators Ciuffo and Williams to its detriment, which caused substantial damages and injuries to SCHC, the SCDOI, and the citizens of the State of South Carolina.

76.    Defendants committed unlawful, overt acts in furtherance of the conspiracy, which resulted in injury to SCHC, the SCDOI, and the citizens of the State of South Carolina.

77.    As a result of the foregoing, the Defendants are jointly and severally liable to the Plaintiff for actual damages in an amount to be determined at trial, as well as punitive damages, costs, pre and post-judgment interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

### FOR A FIFTH CAUSE OF ACTION
### (Conversion against All Defendants)

78.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

79.    Defendants jointly facilitated the conversion of millions of dollars from SCHC through fraud and deceit, by engaging in a scheme to defraud wherein SCHC paid considerable fees in exchange for the fraudulent LOCs.

80.    Defendants wrongfully exercised dominion and control over SCHC's money.

81.    Defendants took the funds from SCHC with the intention to permanently deprive SCHC, the lawful owner, of its funds. Defendants further refused to return SCHC's funds after receiving demand letters from SCHC. A copy of the demand letters are attached hereto as Exhibit 16 and incorporated herein.

82.     As a direct and proximate result of Defendants' actions, SCHC, the SCDOI, and the citizens of South Carolina have suffered substantial damages and injuries.

83.     As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff for actual damages in an amount to be determined at trial, as well as punitive damages, costs, pre- and post-judgments interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

**FOR A SIXTH CAUSE OF ACTION**
**(Unjust Enrichment against All Defendants)**

84.     Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

85.     Defendants have been unjustly enriched through their fraudulent scheme to defraud SCHC out of millions of dollars.

86.     It would be inequitable for Defendants to retain the benefits of their fraudulent acts without paying the value thereof to SCHC.

87.     No other remedy at law can adequately compensate SCHC for the damages by the Defendants' scheme to defraud SCHC out of millions of dollars in brokerage fees in exchange for fraudulent LOCs.

88.     The money paid by SCHC should be disgorged and returned to SCHC to prevent unjust enrichment to the Defendants.

89.     As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff for actual damages in an amount to be determined at trial, as well as punitive damages, costs, pre- and post-judgments interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

## FOR A SEVENTH CAUSE OF ACTION
### (South Carolina Unfair Trade Practices Act against All Defendants)

90.     Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

91.     Section 39-5-20 of the *South Carolina Code* prohibits any unfair or deceptive trade practices in the conduct of any trade or commerce. That section further provides that any person suffering an ascertainable loss of money or property as a result of the use by another person of an unfair or deceptive method, act or practice may bring an action individually to recover damages.

92.     The conduct of Defendants, as set forth above, constitutes an unfair and deceptive act and/or practice within the contemplation of South Carolina's Unfair Trade Practices Act. Defendants knowingly and willfully engaged in a scheme to defraud SCHC out of millions of dollars.

93.     The unfair acts and practices of Defendants have an impact on the public interest and have the potential for repetition.

94.     Defendants' conduct in engaging in unfair and deceptive acts and practices is the actual and proximate cause of injury and damages to SCHC.

95.     Defendants' conduct as alleged herein constitutes violations of South Carolina's Unfair Trade Practices Act for which the Defendants are jointly liable to the Plaintiff. Plaintiff is entitled to recover from Defendants actual damages in an amount to be determined at trial, as well as treble damages, punitive damages, costs, pre- and post-judgments interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

## PRAYER FOR RELIEF

Plaintiff demands judgement against each Defendant jointly and severally for actual and consequential damages, costs, attorneys' fees, pre- and post-judgment interest, treble damages, as well as punitive damages against each individual Defendant on each count; and such other relief as this Court should find to be just and proper.


YOUNG CLEMENT RIVERS, LLP


By: /s/ Michael A. Molony
Michael A. Molony       Federal I.D. # 3953
        Email: mmolony@ycrlaw.com
Jeffrey J. Wiseman       Federal I.D. # 9586
        Email: jwiseman@ycrlaw.com
T. Douglas Concannon     Federal I.D. # 6128
        Email: dconcannon@ycrlaw.com
Mary S. Willis          Federal I.D. # 12388
        Email: mwillis@ycrlaw.com
25 Calhoun Street, Suite 400
Charleston, South Carolina  29401
*Attorneys for the Plaintiff*

Charleston, South Carolina

Dated: August 8, 2017