**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION**

| | | |
|---|---|---|
| MICHAEL J. FITZGIBBONS, ACTING ON BEHALF OF THE DIRECTOR OF THE SOUTH CAROLINA DEPARTMENT OF INSURANCE, IN HIS CAPACITY AS THE SPECIAL DEPUTY RECEIVER OF THE SOUTH CAROLINA HEALTH COOPERATIVE, INC., A MULTIPLE EMPLOYER SELF-INSURED HEALTH PLAN, | ) ) ) ) ) ) ) ) ) ) | **C.A. NO. 8:17-CV-2092-AMQ-JDA** |
| PLAINTIFF, | ) ) ) | |
| vs. | ) ) | |
| ALTON ATKINSON;  JOHN THOMAS CHILDS, IV; LARRY BUSCH; MICHAEL CIUFFO; DESHAUN WILLIAMS; CHERISE RAYMOND; ANDRE GARCIA LITTLEJOHN; VICKIE DAMON; WINSTON COOK; KRISTIN KETTERMAN; DANIEL WHEELER; REGENT FINANCIAL D/B/A PF HOLDINGS; LLC; KING CAPITAL GROUP; A-Z CONSULTING; INTERLINK GLOBAL MESSAGING, LLC; INTERMEDIARY NETWORK; BUSCH LAW CENTER; JJLJ FINANCIAL; PROTÉGÉ INVESTMENTS, LLC; IGWT CONSULTING, LLC; COOK BUSINESS SERVICES; AND JOHN DOES 1-10. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **AMENDED COMPLAINT (JURY TRIAL DEMANDED)** |
| DEFENDANTS. | ) ) ) | |

COMES NOW, Plaintiff Michael J. FitzGibbons, Special Deputy Receiver, on behalf of

the Director of the South Carolina Department of Department of Insurance, the Court-appointed

Receiver for South Carolina Health Cooperative, Inc., by and through his undersigned counsel,

and sets forth this complaint for compensatory, consequential, punitive, and treble damages, as well as costs, attorneys' fees, and pre- and post-judgment interest.  The Plaintiff seeks relief from this Court based on Defendants' racketeering activity which was facilitated by means of wire and mail fraud in violation of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.*, commonly known as Civil RICO, and has affected thousands of victims in South Carolina and across the nation.  Plaintiff further alleges Defendants are liable to the Plaintiff for conspiracy to violate Civil RICO, fraudulent misrepresentation, civil conspiracy, conversion, unjust enrichment, and violations of the South Carolina Unfair Trade Practices Act. In support thereof, Plaintiff avers the following:

## Jurisdiction

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1332. Pursuant to 28 U.S.C. § 1331, the District Court has original jurisdiction over this action because it arises under the federal laws of the United States. The instant case involves violations of 18 U.S.C. §§ 1962 and 1964 of the Civil RICO Act.

2.      Furthermore, this Court has supplemental jurisdiction over the state law claims of fraudulent misrepresentation, civil conspiracy, conversion, unjust enrichment, and violations of the South Carolina Unfair Trade Practices Act pursuant to 28 U.S.C. § 1367(a) because these claims are so related and arise from the same common nucleus of operative fact to the Civil RICO claim, which is within this Court's original jurisdiction, that the claims form part of the same case and controversy under Article III of the United States Constitution. It is clear that judicial economy, as well as convenience and fairness to litigants require the same case to be tried at one time.

3.      As an additional ground, this Court also has jurisdiction pursuant to 28 U.S.C. § 1332, as the diversity of citizenship requirements have been met in this action. South Carolina Health Cooperative, Inc., a Multiple Employer Self-Insured Health plan, (hereinafter referred to as "SCHC") is a corporation organized and existing under the laws of South Carolina, and none of the defendants are incorporated, reside, or have their principal place of business in South Carolina. Furthermore, the total amount in controversy clearly exceeds the sum of seventy-five thousand dollars ($75,000) exclusive of interest and costs, as the fraudulent letters of credit alone amount to $8 million.

4.      This Court has personal jurisdiction over the Defendants under South Carolina's long-arm statute, *South Carolina Code* § 36-2-803, which authorizes personal jurisdiction over a person transacting any business in this State and causing tortious injury in this State by an act or omission outside this State if he regularly derives substantial revenue from services rendered in this State. Defendants, through their racketeering activities, have committed criminal and tortious acts in this state. Therefore, all of the minimum contact requirements of the Due Process Clause of the United States Constitution have been met.

5.      This Court also has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(b), (d) and *Federal Rule of Civil Procedure* 4(k)(1)(D). Section 1965(b) of the Civil RICO Act provides that process may be served "in any judicial district of the United States" when required by the "ends of justice." Section 1965(d) allows process to be served "in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." Courts have held that such "nationwide service of process" provisions also confer personal jurisdiction over a defendant in any

judicial district as long as the defendant has minimum contacts with the United States. *See ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997).

### Venue

6.     Venue is proper in the Anderson Division of the United States District Court for the District of South Carolina pursuant to 28 U.S.C. § 1391(b)(2) and (3) because: (1) a substantial part of the events or omissions giving rise to the claim occurred in this district; and (b) because Defendants have significant contacts with this district by conducting business within this district and taking overt acts in furtherance of their scheme to defraud SCHC within this district.

7.     SCHC was headquartered in the City of Seneca, which is completely within the Anderson Division of the United States District Court for the District of South Carolina.

8.     Finally, venue is proper in this federal judicial district in accordance with 18 U.S.C. § 1965(a), which provides for venue in any federal district in which a RICO defendant transacts his affairs.  Venue is also proper pursuant to 18 U.S.C. § 1965(b), which permits an action against multiple defendants to proceed in a single district if the ends of justice require it.

### Plaintiff

9.     The Director of the South Carolina Department of Insurance ("Director") is the Court-appointed Rehabilitator for SCHC pursuant to a Consent Order commencing Rehabilitation Proceedings and Granting an Injunction and Automatic Stay of Proceedings (the "Rehabilitation Order") executed on December 22, 2014 by the Honorable L. Casey Manning, Chief Administrative Judge, Fifth Judicial Circuit, Court

of Common Pleas, South Carolina in the case of *Raymond G. Farmer v. South Carolina Health Cooperative, Inc., a Multiple Employer Self-Insured Health Plan*, C/A No.: 2014-CP-40-7340. The Rehabilitation Order also appointed the Plaintiff as Special Deputy Receiver of SCHC.

10.    As Rehabilitator of SCHC, the Plaintiff has all powers enumerated in the Rehabilitation Order and others found in Chapter 27 of Title 38 of the *South Carolina Code*.

11.    SCHC is a South Carolina corporation, having filed its Articles of Incorporation with the South Carolina Secretary of State on October 16, 2009.

12.    SCHC is a "person" within the meaning of 18 U.S.C. § 1961(3) and 1964(c).

13.    The Plaintiff brings the above-captioned action on behalf of SCHC against the Defendants, who were collectively involved in a scheme to defraud, and did defraud, SCHC and other innocent victims by knowingly and intentionally entering into fraudulent transactions through the sale of fraudulent Stand-By Letters of Credit ("LOC") in exchange for substantial fees. Specifically, as to SCHC, SCHC paid Two Million ($2,000,000.00) dollars in fees to the RICO Enterprise for purportedly legitimate LOCs. Those fees were not used to secure legitimate LOCs and were thereafter disbursed among the Defendants individually and through their sham entities for their own personal financial gain and to further the objectives of the RICO Enterprise.

## The RICO Defendants

14.    Each of the following Defendants, consisting of individual associates functioning as a continuing unit and their alter ego and/or sham entities (hereinafter

collectively referred to as the "RICO Defendants"), comprise the RICO Enterprise, and all of whom were directly or indirectly engaged in a pattern of racketeering activity in violation of 18 U.S.C. §§ 1341 and 1343 through the sale of fraudulent Stand By Letters of Credit in exchange for exorbitant fees:

a.     Alton Anthony Atkinson ("Atkinson") is a resident of Toronto, Ontario and at all times relevant herein was a principal and agent of Regent Financial d/b/a PF Holdings, LLC ("Regent Financial") and King Capital Group ("King Capital"). Atkinson is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where he was associated in fact for criminal purposes. Atkinson is liable under RICO for his participation in conducting the affairs of the association in fact. Atkinson also conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Cook, Busch, Ketterman, Damon, Childs, Raymond, Wheeler, and Ciuffo, along with the entities they controlled.

b.     Atkinson, like other Defendants, took a portion of the monies raised, conspired and acted with the aid the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. He also transferred and/or directed others to transfer some of the illicit proceeds to other Defendants and made personal use of the illegitimate monies obtained.

c.     Regent Financial is one of Atkinson's sham entities which, upon information and belief, is organized under the laws of Toronto, Ontario.

d.  King Capital is one of Atkinson's sham entities, which is believed to be a Canadian company with a corporate address at 62 Harwood Ave. S., Suite 4; Ajax, Ontario L1S 2H6.

e.  John Thomas Childs, IV ("Childs") is a resident of the State of California and at all times relevant herein was a principal and agent of Intermediary-Network.com, Interlink Global Messaging, LLC and A-Z Consulting, LLC.  Childs is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where he was associated in fact for criminal purposes. Childs is liable under RICO for his participation in conducting the affairs of the association in fact. At times, Childs served as the face of the Enterprise in the negotiation of the sale of the fraudulent LOCs with SCHC, and he has also conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Ketterman, Cook, Busch, Damon, Atkinson, Raymond, Wheeler, and Ciuffo, along with the entities they controlled through the sale of fraudulent LOCs in, among other places, South Carolina, Alabama, and Texas.

f.  Childs, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. He also made personal use of the illegitimate monies obtained.

g.     A-Z Consulting, LLC ("AZ Consulting") is one of Childs' sham entities and is a limited liability company organized and existing under the laws of the State of California.

h.     Upon information and belief, Intermediary-Network.com is one of Childs' sham entities and is a corporation organized and existing in a state other than South Carolina.

i.     Upon information and belief, Interlink Global Messaging, LLC ("IGM") is one of Childs' sham entities and is a limited liability company organized and existing in a state other than South Carolina.

j.     Larry Busch ("Busch") is a resident of the State of Arizona and at all times relevant herein was a principal and agent of The Busch Law Center, LLC. Busch is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where he was associated in fact for criminal purposes. Busch is liable under RICO for his participation in conducting the affairs of the association in fact. Busch has acted as escrow agent in the schemes to defraud and his bank records reveal transfers among the defendants. He also conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Ketterman, Cook, Childs, Damon, Atkinson, Raymond, Wheeler, and Ciuffo, along with the entities they controlled.

k.     Busch, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or

maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. He aided in the transfer of the illicit proceeds to other Defendants and made personal use of the illegitimate monies.

l.     The Busch Law Center, LLC ("The Busch Law Center") is a limited liability company organized and existing under the laws of the State of Arizona and its sole member is a resident of Arizona. Busch utilized the escrow account at the Busch Law Center to carry out the fraudulent schemes.

m.     Michael Ciuffo ("Ciuffo") is a resident of the State of New York. Ciuffo is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where he was associated in fact for criminal purposes. Ciuffo is liable under RICO for his participation in conducting the affairs of the association in fact. At times, Ciuffo served as the face of the Enterprise in the negotiation of the sale of the fraudulent LOCs with SCHC, and he has also conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Ketterman, Cook, Childs, Atkinson, Wheeler, Damon, Raymond, and, Busch along with the entities they controlled through the sale of fraudulent letters of credit in, among other places, South Carolina and New York.

n.     Ciuffo, like other Defendants, took a portion of the monies raised, conspired and acted with the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. He also made personal use of the illegitimate monies obtained.

o.    De'Shaun Williams ("Williams") is a resident of the State of California and at all times relevant herein was a principal and agent of Protégé Investments, LLC. Williams is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where he was associated in fact for criminal purposes. Williams is liable under RICO for his participation in conducting the affairs of the association in fact. At times, Williams served as the face of the Enterprise in the negotiation of and sale of the fraudulent LOCs with SCHC, and he also conspired and acted with other individuals including, *inter alia*, Ciuffo, A. Littlejohn, Cook, Childs, Atkinson, Wheeler, Damon, Ketterman, Raymond, and Busch along with the entities they controlled.

p.    Williams, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. He also made personal use of the illegitimate monies obtained.

q.    Protégé Investments, LLC ("Protégé Investments") is one of Williams' sham entities, and is a limited liability company organized under the laws of the State of Nevada.

r.    Cherise Raymond ("Raymond") is a resident of the State of New Jersey. Raymond is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where she was associated in fact for criminal purposes. Raymond is

liable under RICO for her participation in conducting the affairs of the association in fact. Raymond assisted Williams in his negotiation of the sale of the fraudulent LOCs with SCHC, and she has also conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Ketterman, Cook, Childs, Atkinson, Wheeler, Damon, Ciuffo, and, Busch along with the entities they controlled.

s.     Raymond, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. She also made personal use of the illegitimate monies obtained.

t.     Andre Garcia Littlejohn ("A. Littlejohn") is a resident of the State of California and at all times relevant herein was a principal and agent of JJLJ Financial, LLC. A. Littlejohn is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where he was associated in fact for criminal purposes. A. Littlejohn is liable under RICO for his participation in conducting the affairs of the association in fact. A. Littlejohn conspired and acted with other individuals including, *inter alia*, Williams, Ciuffo, Ketterman, Cook, Childs, Atkinson, Wheeler, Damon, Raymond, and, Busch along with the entities they controlled.

u.     A. Littlejohn, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying

and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. He also made personal use of the illegitimate monies obtained.

v.      JJLJ Financial, LLC ("JJLJ Financial") is one A. Littlejohn's sham entities, and is a limited liability company organized and existing under the laws of the State of California.

w.      Vickie Damon ("Damon") is a resident of the State of California and at all times relevant herein was a principal and agent of IGWT Consulting, LLC. Damon is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where she was associated in fact for criminal purposes. Damon is liable under RICO for her participation in conducting the affairs of the association in fact. At times, Damon conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Cook, Ketterman, Childs, Atkinson, Wheeler, Ciuffo, Raymond, and Busch along with the entities they controlled.

x.      Damon, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. She also made personal use of the illegitimate monies obtained.

y.      IGWT is one of Damon's sham entities and is a limited liability company organized and existing under the laws of the State of Nevada.

z.      Winston Cook ("Cook") is a resident of the State of Georgia and at all times relevant herein was a principal and agent of Cook Business Services,

LLC. Cook is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where he was associated in fact for criminal purposes. Cook is liable under RICO for his participation in conducting the affairs of the association in fact. Cook conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Ciuffo, Ketterman, Childs, Atkinson, Wheeler, Damon, Raymond, and Busch, along with the entities they controlled.

aa.    Cook, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. He also made personal use of the illegitimate monies obtained.

bb.    Cook Business Services, LLC ("Cook Business Services") is a limited liability company organized and existing under the laws of the State of Georgia.

cc.    Daniel Wheeler ("Wheeler") is a resident of the State of California. Wheeler is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where he was associated in fact for criminal purposes. Wheeler is liable under RICO for his participation in conducting the affairs of the association in fact. Wheeler conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Cook, Childs, Atkinson, Ciuffo, Ketterman, Damon, Raymond, and, Busch, along with the entities they controlled.

dd.     Wheeler, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. He also made personal use of the illegitimate monies obtained.

ee.     Kristin Ketterman ("Ketterman") is a resident of State of California. Ketterman is a culpable individual who engaged in a pattern of racketeering activity connected with the establishment, conduct, and/or control of the Enterprise where she was associated in fact for criminal purposes. Ketterman is liable under RICO for her participation in conducting the affairs of the association in fact. Ketterman conspired and acted with other individuals including, *inter alia*, Williams, A. Littlejohn, Cook, Childs, Atkinson, Ciuffo, Damon, Raymond, Wheeler, and, Busch, along with the entities they controlled.

ff.     Ketterman, like the other Defendants, took a portion of the monies raised, conspired and acted with the aid of the other Defendants along with the entities they controlled and participated in a number of schemes, lying and/or maliciously and intentionally misleading innocent victims into purchasing fraudulent LOCs. She also made personal use of the illegitimate monies obtained.

15.     All entity Defendants, even those formally organized as corporations or limited liability companies, are alter egos of other Defendants as set forth above, which those Defendants dominate and control in order to perpetrate fraud. Individual Defendants utilized their sham entities to funnel monies into the Defendants' operation and for the distribution of funds out of the organization to the individual associates.

16.     Defendants, individually and through their respective corporate entities, are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a), (c) and (d).

17.     Defendants' activity began years prior to their nexus to SCHC and the Enterprise previously and contemporaneously defrauded other innocent victims through the sale of, among other things, fraudulent LOCs. The RICO Defendants assimilated their on-going criminal racketeering activities into the events that led to Plaintiff's lawsuit. Defendants' and co-conspirators' racketeering activity is characterized by the continuous predation embodied by a plethora of RICO predicate crimes and overt criminal acts in furtherance of the conspiracy and that racketeering activity. The activity described herein, when temporally viewed with the events described by Plaintiff relating to SCHC, substantiated and warrants the expectation of Defendants' continued criminal activity, particularly, their involvement in racketeering, well into the future.

### Facts relating to the Scheme to Defraud SCHC

18.     A Multiple Employer Welfare Arrangement ("MEWA") is an insurance arrangement whereby a group of member employers pool contributions to provide health, dental, and short term disability benefits to their employees.

19.     The South Carolina General Assembly enacted S.C. Code Ann. §§ 38-41-10 *et seq.* to allow for the creation, operation, and regulation of MEWAs in South Carolina. The MEWA member employers essentially bear their own risk, so MEWA policies are statutorily prohibited from receiving guaranty fund protection. *See* S.C. Code Ann. § 38-29-40.

20.     Because MEWAs do not have guaranty fund protection, the SCDOI imposed certain financial requirements upon SCHC before it could begin its operations.

One of the principal conditions in SCHC's June 15, 2012 licensing order was that it must fund and maintain a loss reserve and surplus account in an amount sufficient to satisfy the SCDOI under § 38-41-70 of the *South Carolina Code*. The initial (base) amount was set at $5 million.

21.     In order for SCHC to meet the higher financial requirements, the SCDOI permitted SCHC to fund its loss reserves with an Irrevocable Stand-By Letter of Credit ("LOC") from a bank chartered by this state or a member bank of the Federal Reserve System with a branch office in this state or otherwise approved by the director or his designee.

22.     The LOC was to serve as a last resort resource to pay claims in the event SCHC's liabilities exceeded its assets and SCHC was declared insolvent.

23.     In late 2011, Mark Goodman ("Goodman"), a principal and initial investor in CSA, advised Cooper Littlejohn, then-CEO of SCHC, to obtain a commercial LOC through IGM and its affiliate, Protégé Investments. Goodman placed Cooper Littlejohn in contact with Ciuffo, who thereafter negotiated the sale of the first fraudulent LOC ("LOC #1") to SCHC, ostensibly from Bank of America. A copy of the emails evidencing this negotiation are attached hereto as Exhibit 1 and incorporated herein.

24.     On or about May 1, 2012, Cooper Littlejohn entered into a Finders Fee Agreement with IGM, an affiliate of Protégé Investments, committing SCHC to pay $600,000 for IGM's assistance in obtaining a $5 Million (5,000,000.00) Dollar LOC. A copy of the Finder Fee Agreement is attached hereto as Exhibit 2 and incorporated herein.

25.    On or about June 1, 2012, Atkinson, through PF Holdings, entered into an agreement with Childs and IGM to "assist" in obtaining the fraudulent LOC in exchange for $275,000. The Agreement provides, among other things, "The Consultant (PF Holdings) will arrange for sending of a Standby Letter of Credit from Bank of America to the client's beneficiary entity. Upon receipt a copy of the Hard Copy being issued from the issuing bank, the customer will release $275,000 USD to the Consultant." A copy of this Agreement is attached hereto as Exhibit 3. Pursuant to that Agreement, the "fee" was to be payable to PF Holdings through the Busch Law Center. *See* Exhibit 3, pp. 2.

26.    On or about June 2, 2012, SCHC wired $600,000 in brokerage fees to IGM's closing agent, The Busch Law Center.  The Busch Law Center disbursed those fees to the Defendants as set forth below:

a.    Pursuant to the Agreement between Childs and PF Holding, the Busch Law Center disbursed $275,000 to Boddie & Associates' Trust Account on June 4, 2012. *See* June 4, 2012 Memorandum, a copy of which is attached hereto as Exhibit 3, pp. 10–11. Boddie & Associates' Trust Account retained $5,500, and thereafter disbursed the remaining fees to the Defendants as set forth below:

(1)    $100,750 to JJLJ Financial on June 5, 2012;

(2)    $53,000 to King Capital on June 5, 2012;

(3)    $80,000 to IGWT Consulting on June 5, 2012;

(4)    $88,750 to Regent Financial on July 12, 2012.

b.    $105,515.40 disbursed to JJLJ Financial on June 4, 2012;

c.    $49,015.40 disbursed to Ciuffo on June 4, 2012;

    d.  $46,015.40 disbursed to Williams on June 4, 2012;

    e.  $3,000 disbursed to Raymond on June 4, 2012;

    f.  $1,000 disbursed to A. Childs on June 5, 2012;

    g.  $20,000 disbursed to Zion Trust on June 5, 2012;

    h.  $4,515.40 disbursed to Sharon Colker on June 5, 2012;

    i.  $6,340.40 disbursed to Intermediary Network on June 5, 2012;

    j.  $10,000 disbursed to A-Z Consulting on June 11, 2012;

    k.  $5,250 disbursed to Regent Financial on June 14, 2014;

    l.  $5,700 disbursed to Davidson on July 23, 2012;

    m.  $20,000 disbursed to A-Z Consulting on July 23, 2012;

    n.  $1,000 disbursed to A. Childs on August 2, 2012;

    o.  $10,000 disbursed to A-Z Consulting on August 23, 2012;

    p.  $28,700 disbursed to A-Z Consulting on September 4, 2012; and

    q.  $1,300 disbursed to A. Childs on September 4, 2012.

A copy of the Busch's escrow records and bank statements evidencing these wire transfers are attached hereto as Exhibit 4 and incorporated herein.

27.    After receiving SCHC's funds, Protégé Investments sent LOC No. 1 to SCHC via US Mail. SCHC gave the original LOC to the South Carolina Department of Insurance ("SCDOI") for safekeeping. A copy of LOC No. 1 is attached hereto as Exhibit 5 and incorporated herein.

28.    Letters of credit must be renewed annually. On April 5, 2013, in a series of emails, Williams represented to Cooper Littlejohn, then-CEO of SCHC, that Protégé Investments would renew LOC No. 1 for SCHC at the cost of $525,000, a 10.5 percent

fee, despite actual knowledge LOC No. 1 was fraudulent. A copy of the emails evidencing these negotiations are attached hereto as Exhibit 6 and incorporated herein.

29.    To complete this transaction, SCHC wired the fees to The Busch Law Firm, IGM's closing agent, which again disbursed the fees to the Defendants as set forth below:

    a.    $279,825 disbursed to JJLJ Financial on May 8, 2013. JJLJ Financial thereafter disbursed the fees to the Defendants as set forth below:

        (1)    $65,000 to Regent Financial, at the direction of Atkinson, on May 8, 2013;

        (2)    $35,000 to Wheeler, at the direction of Atkinson, on May 8, 2013;

    b.    $15,000 disbursed to Raymond on May 8, 2013;

    c.    $50,000 disbursed to Safefunds.com on May 8, 2013;

    d.    $13,565.75 disbursed to Williams on May 8, 2013;

    e.    $29,925 disbursed to Zion Trust on May 7, 2013; and

    f.    $125,847.25 disbursed to A-Z Consulting on May 7, 2013.

A copy of Busch's escrow records and bank statements evidencing these wire transfers are attached hereto as Exhibit 7 and incorporated herein.

30.    After receiving SCHC's funds, Protégé Investments sent a renewal of LOC No. 1 to SCHC via US Mail. A copy of the renewal of LOC No. 1 is attached hereto as Exhibit 8 and incorporated herein.

31.    By mid-2013, the SCDOI determined SCHC's loss reserve account should be increased by $3 million. On July 31, 2013, in a series of emails between Williams and Cooper Littlejohn, Williams represented Protégé Investments would provide a second

fraudulent LOC ("LOC No. 2") for SCHC in exchange for $350,000, despite actual knowledge LOC No. 2 was fraudulent. A copy of the emails evidencing this negotiation are attached hereto as <u>Exhibit 9</u> and incorporated herein.

32. On or about November 25, 2013, SCHC wired a $350,000 (11.6 percent) brokerage fee to The Busch Law Center. The Busch Law Center again disbursed the fees to the Defendants as set forth below:

a. $2,500 disbursed to Williams on November 26, 2013;

b. $2,500 disbursed to Raymond on November 26, 2013;

c. $46,000 disbursed to Williams on November 26, 2013;

d. $14,500 disbursed to Raymond on November 26, 2013;

e. $78,000 disbursed to Regent Financial on November 26, 2013;

f. $6,700 disbursed to Cook Business Services on December 3, 2013;

g. $90,800 disbursed to JJLJ Financial on December 4, 2013;

h. $500 disbursed to The Busch Law Center on December 6, 2013;

i. $2,000 disbursed to The Busch Law Center on December 6, 2013;

j. $21,700 disbursed to Childs on December 4, 2013;

k. $6,700 disbursed to Cook Business Services on December 3, 2013; and

l. $70,838 disbursed to Intermediary Network on December 4, 2013.

A copy of the Busch's escrow records and bank statements evidencing these wire transfers are attached hereto as <u>Exhibit 10</u> and incorporated herein.

33. After receiving SCHC's funds, Protégé Investments sent LOC No. 2 to SCHC via US Mail. A copy of LOC No. 2 is attached hereto as <u>Exhibit 11</u> and incorporated herein.

34.     The following year, around June of 2014, Williams again represented to SCHC that Protégé Investments would renew LOC No. 1 for $525,000 in brokerage fees, despite actual knowledge LOC No. 1 was fraudulent. A copy of the emails evidencing this negotiation are attached hereto as Exhibit 12 and incorporated herein.

35.     To obtain the renewal, SCHC wired $525,000 in fees to Velocity Partners, LLC. Velocity Partners disbursed the fees to the Defendants as set forth below:

a.  $15,000 to Regent Financial on June 2, 2014;

b.  $16,244 to Paragon Venture Group on June 2, 2014;

c.  $2,706.50 to Raymond on June 3, 2014;

d.  $2,706.50 to Williams on June 3, 2014;

e.  $11,250 to Regent Financial on June 10, 2014;

f.  $195,141.80 to Paragon Venture Group on June 10, 2014. Paragon Venture Group, through its principal Tim Carr, thereafter disbursed the fees to the Defendants as set forth below:

   (1)   $92,570.90 to Ketterman on June 10, 2014;

   (2)   $8,122 to Childs at some point in 2014.

g.  $98,730 to Regent Financial on June 10, 2014. Regent Financial thereafter disbursed $37,500 to JJLJ Financial;

h.  $27,441.60 to Raymond on June 10, 2014;

i.  $97,039 to JJLJ Financial on June 10, 2014; and

j.  $40,441.60 to Williams on June 10, 2014.

A copy of the bank statements evidencing these wire transfers are attached hereto as Exhibit 13 and incorporated herein.

36.     After receiving SCHC's funds, Protégé Investments sent a renewal of LOC No. 1 to SCHC via US Mail. A copy of the renewal of LOC No. 1 is attached hereto as Exhibit 14 and incorporated herein.

37.     LOC No. 2 was due for renewal on November 20, 2014. However, on October 24, 2014, the Alabama Securities Commissioner sent an advisory warning to Chiles Stifle, then-CFO of SCHC, about a fraud case being pursued against many of the above-named Defendants. Stifle forwarded the warning to SCHC's then-President David Black on Saturday, October 25, and Black in turn sent it to SCDOI Deputy Director Lee Hill.

38.     On Monday, October 27, 2014, the SCDOI informally confirmed both LOC No. 1 and LOC No. 2 were fraudulent. This fact was formally confirmed by Bank of American via letter on November 10, 2014, a copy of which is attached hereto as Exhibit 15 and incorporated herein.

39.     SCHC was placed into rehabilitation by the Richland County Court of Common Pleas on December 23, 2014, and Michael J. Fitzgibbons was appointed as the Special Deputy Receiver. On the last day of coverage, the Receiver determined SCHC's plan had an unpaid liability of $11.379 million.

### Facts Related to Other Schemes to Defraud

40.     In addition to its scheme to defraud SCHC, Defendants have operated together as a continuing unit and members of the Enterprise to carry out its common purpose of defrauding innocent victims through the sale of fraudulent letters of credit, as evidenced by the following civil lawsuits and criminal indictments:

a.    *State of Alabama v. John Childs*, C/A No. 0:13-cv-02266-JRT-LIB, Circuit Court of Baldwin County, Alabama. The Alabama Securities Commission prosecuted and convicted John Childs, De'Shaun Williams, Brandon Colker,[1] and Larry Busch, among others, for their involvement in a complex fraud case where investors were robbed out of millions of dollars. Childs and his co-defendants received undisclosed brokers fees for years by having the funds first sent to Larry Busch's escrow account at the Busch Law Center and then Busch disbursed the funds to Childs and his entities, namely, Intermediary network, Interlink Global Messaging, and A-Z Consulting Group, as well as the other defendants. In addition, while awaiting trial in this criminal prosecution, co-defendants reengaged in their criminal conduct by, among other things, promoting the sale of fraudulent LOCs purportedly worth $10,000,000, thereby resulting in a revocation of bond.

b.    *Yellow Brick Road, LLC v. Scott Koster, John Childs, Alicorn Capital Management, LLC, Richard Hall, Christine Wong-Sang, Greg Botolino, Vladimir Pierre Louis, Berea, Inc., Success Bullion USA, LLC, Centerlink LLC, Larry Busch, Busch Law Center, LLC, and Hendrix Touissant*, C/A No.: 0:13-cv-02266-JRT-LIB, United States District Court, District of Minnesota. Plaintiff, Yellow Brick Road, LLC, filed a lawsuit against, among others, Childs, Busch, and the Busch Law Center after it paid Defendants $300,000 for a LOC, which turned out to be fraudulent. The $300,000 was wired to Larry Busch's escrow account and out to, among others, John Childs.

---

[1] Brandon Colker settled with the Plaintiff in relation to the scheme to defraud SCHC prior to this lawsuit and is therefore not named as a Defendant.

c. *R. Lance Flores and Vicki Clarkson v. Scott Anthony Koster et. al*, C/A No. 3:11-cv-00726-M-BH, United States District Court for the Northern District of Texas, Dallas Division. Plaintiffs filed Civil RICO lawsuit against, among others, Scott Anthony Koster d/b/a Interlink Global Messaging, Cook, Cook Business Services, Childs, the Busch Law Center, and Brandon Colker. In this lawsuit, a similar scheme to defraud innocent victims is alleged and the same or similar documents were exchanged among many of the same defendants. *See* Flores Exhibits, a copy of which is attached hereto as <u>Exhibit 16</u>.

d. In addition to the foregoing, Plaintiff is in possession of bank records evidencing the transfer of monies among the RICO Defendants unrelated to the sale of fraudulent LOCs to SCHC, which further evidences an ongoing organization made up of associates functioning as a continuing unit as part of the RICO Enterprise.

## **CIVIL RICO**

41. The Civil RICO claims discussed herein are governed by 18 U.S.C. § 1962 (a), (c), (d) and 18 U.S.C. § 1964. Defendants, through a pattern of racketeering, have committed the underlying predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

42. At all relevant times herein, the "enterprise" described herein operated separately and distinct from each individual Defendant. The enterprise, consisting of the individual Defendants and their sham entities—i.e., the associates—operated for the common purpose of implementing and conducting schemes to defraud innocent victims, including but not limited to SCHC, through the sale of fraudulent LOCs. Each Defendant

willingly participated directly or indirectly in the operations of the enterprise, as set forth herein.

43.     Each of the individual Defendants and their sham entities constitute a group of persons associated together for the common purpose of implementing and conducting schemes to defraud innocent victims, as part of an ongoing organization, with various associates functioning as a continuing unit, thereby constituting an association in fact enterprise within the meaning of 18 U.S.C. § 1961 ("The RICO Enterprise"). In time, Defendants brought on other individuals into their expanding association in fact enterprise (while other associates left the organization), thereby creating an interstate network of career crooks operating across the United States and Canada.[2]

44.     Defendants' primary purpose and objective was to defraud innocent victims, including but not limited to SCHC, through the sale of fraudulent LOCs under the pretense that the documents sold were valid and in exchange for substantial fees in order to generate income for the members and associates of the Enterprise.

45.     Defendants' association in fact enterprise is evidenced by their scheme to defraud SCHC out of several million dollars, but it is further evidenced by their concerted other efforts to defraud victims in similar schemes to defraud across the nation, as well as bank records evidencing wire transfers between the Defendants unrelated to the money stolen from SCHC.

---

[2] Alleging an "enterprise" requires three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit (even if some leave as long as the organization remains the same); and (3) the enterprise is an entity separate and apart from the pattern of activity in which it engages. *United States v. Tillet*, 763 F.2d 628, 631 (4th Cir. 1985).

## The Patterns of Racketeering Activity

46.     RICO provides protections against patterns of racketeering, which consist of the repeated violations of predicate acts which are criminal violations such as mail fraud and wire fraud.

47.     The acts described herein have the same or similar purposes, results, participants, and methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.

48.     The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the RICO Enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(a) and (c), including but not limited to:

        a.     The RICO Defendants engineered a scheme to defraud SCHC and other innocent victims by representing that they would provide LOCs in exchange for considerable fees;

        b.     The racketeering acts identified herein were related to one another and formed a pattern of racketeering activity in that they were in furtherance of a common goal of defrauding innocent victims to generate income for the members and associates of the Enterprise;

        c.     In furtherance of their scheme, by means of wire and mail fraud in interstate or foreign commerce, including but not limited to, negotiating the fraudulent transactions via email, the transmittal of payments through the wires to various accounts, and the transmittal of the fraudulent LOCs via US Mail, as set forth herein, the RICO Defendants knowingly deceived SCHC and other innocent

victims into paying considerable fees to be disbursed among the RICO Defendants for their own personal gain;

d.    The RICO Defendants participated in the scheme and knowingly, willfully, and with the specific intent to deceive and/or defraud SCHC and other innocent victims out of millions of dollars for their own personal gain.

e.    Defendants knowingly and intentionally committed wire and mail fraud by misrepresenting and deceiving SCHC into believing it was participating in legitimate business transactions. Defendants' consistent use of mails and wires to carry out its illicit scheme displays its specific intent to defraud by wire and mail;

f.    The RICO Defendants engaged in multiple, repeated, and continuous acts of mail and interstate wire fraud that constituted a "pattern of racketeering." RICO Defendants would have continued their scheme and conspiracy indefinitely unless discovered by Plaintiff;

g.    Defendants' racketeering activities derived significant income from the implementation of the predicate acts of mail and wire fraud. The predicate acts discussed herein represent related criminal conduct, which has a high probability of continuing as several of the defendants have been sued or indicted in similar schemes in other states, including but not limited to, New York, California, Arizona, Texas, and Alabama. Moreover, the predicate acts represent related criminal conduct, which will go unpunished unless this Court grants immediate relief;

**Predicate Acts to Support RICO Causes of Action**

49.     The underlying predicate acts of mail fraud are clearly evidenced every time the Defendants negotiated with SCHC by telephone, email, and U.S. Mail to carry out its scheme to defraud SCHC out of millions of dollars in exchange for fraudulent LOCs.

50.     18 U.S.C. § 1961(1)(B) defines "racketeering activity" as "any act which is indictable under any of the following provisions," including but not limited to, 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).

51.     The RICO Defendants committed "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B) in that they violated 18 U.S.C. § 1341 by the use of interstate mailings through sending or causing to be sent, the fraudulent LOCs to SCHC.

52.     18 U.S.C. § 1341, commonly known as the mail fraud statute, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever, to be sent or delivered by any private or commercial interstate carrier, or takes or received therefrom, any such matter or thing, or knowingly causes to be directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

53.     The underlying predicate acts of mail fraud are clearly evidenced by the following transactions:

a.      After receiving the funds from SCHC, in June of 2012, Protégé Investments sent LOC No. 1 to SCHC via US Mail. *See* <u>Exhibit 5</u>.

b.      After receiving the funds from SCHC, in May of 2013, Protégé Investments sent a renewal of LOC No. 1 to SCHC via US Mail. *See* <u>Exhibit 8</u>.

c.      After receiving the funds from SCHC, in November of 2013, Protégé Investments sent LOC No. 2 to SCHC via US Mail. *See* <u>Exhibit 11</u>.

d.      After receiving the funds from SCHC, in June 2014, Protégé Investments sent a renewal of LOC No. 1 to SCHC via US Mail. *See* <u>Exhibit 14</u>.

54.    18 U.S.C. § 1343, commonly known as the wire fraud statute, provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds, for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

55.    The RICO Defendants committed "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) in that they violated 18 U.S.C. § 1343 by the use of interstate wires through sending or causing to be sent, numerous emails and phone calls relating to the negotiation and sale of the fraudulent LOCs, as well as the transfer of considerable fees from SCHC to various escrow accounts, which were thereafter disbursed to the RICO Defendants, as set forth herein.

56.    The underlying predicate acts of wire fraud are clearly evidenced by the following wire transfers:

a.    In 2012, SCHC wired $600,000 in brokerage fees to The Busch Law Center in exchange for LOC No. 1. Those funds were thereafter wired to the various defendants for their own personal financial gain. *See* Exhibit 4.

b.    In 2013, SCHC wired $525,000 in brokerage fees to The Busch Law Center to obtain renewal of LOC No. 1. Those funds were thereafter wired to the various defendants for their own personal financial gain. *See* Exhibit 7.

c.    In 2013, SCHC wired $350,000 in brokerage fees to The Busch Law Center to obtain LOC No. 2. Those funds were thereafter wired to the various defendants for their own personal financial gain. *See* Exhibit 10.

d.    In 2014, SCHC wired $525,000 in brokerage fees to Velocity Partners, LLC to obtain renewal of LOC No. 1. Those funds were thereafter wired to the various defendants for their own personal financial gain. *See* Exhibit 13.

57.    The underlying predicate acts of wire fraud are also clearly evidenced by the following emails:

a.    In late 2011, Goodman placed Littlejohn in contact with Ciuffo, who thereafter negotiated the sale of LOC No. 1 via email, despite actual knowledge LOC No. 1 was fraudulent. *See* Exhibit 1.

b.    On April 5, 2013, in a series of emails, Williams represented to Cooper Littlejohn that Protégé Investments would renew LOC No. 1 for SCHC for $525,000, despite actual knowledge LOC No. 1 was fraudulent. *See* Exhibit 6.

c.    On July 31, 2013, in a series of emails between Williams and Cooper Littlejohn, Williams represented Protégé Investments would provide a

second LOC ("LOC No. 2") for SCHC in exchange for $350,000, despite actual knowledge LOC No. 2 was fraudulent. *See* Exhibit 9.

    d.    In 2014, in a series of emails between Williams and Cooper Littlejohn, Williams represented Protégé Investments would renew LOC No. 1 for SCHC for $525,000, despite actual knowledge LOC No. 1 was fraudulent. *See* Exhibit 12.

58.    The predicate acts constitute a pattern of racketeering as defined in 18 U.S.C. § 1961(5). The predicate acts were not isolated events but related acts aimed at the common purpose and goal of defrauding innocent victims to generate income for the members and associates of the Enterprise.

### FOR A FIRST CAUSE OF ACTION
**(18 U.S.C.A. § 1962(a))**

59.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

60.    18 U.S.C.A. § 1962(a) provides, in relevant part:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

61.    At all times relevant, the Enterprise described above constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4) and 1962(a) which is engaged in, and the activities of which affect, interstate or foreign commerce.

62.     Each RICO Defendant received income derived, directly or indirectly, from the pattern of racketeering activity described herein.

63.     As it relates to the scheme to defraud SCHC, the RICO Defendants received income derived from the sale of the fraudulent LOCs, which was thereafter taken for personal use and utilized to continue the operations of the enterprise itself, as set forth below:

    a.  According to bank records, Atkinson received $235,730 through Regent Financial as a result of the following transactions from this illicit scheme;

        i.  Regent Financial received $30,000 from Boddie & Associates' Trust Account on June 12, 2012;

        ii.  Regent Financial received $5,250 from Boddie & Associates' Trust Account on June 14, 2012;

        iii.  Recent Financial received $78,000 from Larry Busch's Trust Account on November 26, 2013; and

        iv.  Regent Financial received $65,000 from JJLJ Financial on May 8, 2013;

        v.  Regent Financial received a total of $124,980 in June of 2014 from Velocity Partners, LLC's Trust Account;

        vi.  Regent Financial paid JJLJ Financial $30,000 on November 13, 2013 and another $37,500 on June 11, 2014.

       vii. According to bank records, King Capital received $53,000 from Boddie and Associates' Trust Account on June 5, 2012.

b. According to bank records, Childs personally and through his various businesses received $301,547 in the following disbursements from this illicit scheme:

       i. A-Z Consulting received $68,700 from Boddie & Associates' Trust Account in 2012;

       ii. Intermediary Network received $6,340 from Larry Busch's Trust Account in 2012;

       iii. Intermediary Network received $70,838 from Larry Busch's Trust Account in 2013;

       iv. A-Z Consulting received $125,847 from Larry Busch's Trust Account in 2013;

       v. Childs received $21,700 from Larry Busch's Trust Account in 2013;

       vi. Childs received $8,122 from the disbursement of the renewal fee in 2014.

c. According to bank records, A. Childs received $3,300 in 2013 for the fraudulent letters of credit.

d. According to bank records, Busch received $2,500 in 2012 for the fraudulent letters of credit. Upon information and belief, Busch received $50,000 from Safefunds.com in 2014 for the fraudulent letters of credit.

The Busch Law Center was the escrow account for the brokerage fees wired for the 2012 and 2013 wire transfers.

e.   According to bank and Busch escrow records, Williams, personally and through Protégé Investments received $151,229 in the following disbursements for the fraudulent letters of credit;

       i.   Williams received $46,015.40 from Larry Busch's Trust Account; in 2012;

       ii.   Williams received $62,065.75 from Larry Busch's Trust Account in 2013;

       iii.   Williams received $43,148 from Velocity Partners, LLC's Trust Account in 2014.

f.   According to bank records, Raymond received $65,148.10 in the following disbursements for the fraudulent letters of credit:

       i.   Raymond received $3,000 in 2012 from Larry Busch's Trust Account;

       ii.   Raymond received $32,000 in 2013 from Larry Busch's Trust Account;

       iii.   Raymond received $30,148.10 in 2014 from Velocity Partner, LLC's Trust Account.

g.   According to bank records, A. Littlejohn received $641,429.40 through JJLJ Financial in the following transactions for the fraudulent letters of credit:

       i.   JJLJ Financial received $105,515.40 from Larry Busch's Trust Account in 2012;

      ii.   JJLJ Financial received $100,750 from Boddie & Associates' Trust Account in 2012;

     iii.   JJLJ Financial received $370,625 from Larry Busch's Trust Account in 2013;

     iv.   JJLJ Financial received $97,039 from Velocity Partners' Trust Account in 2014;

      v.   JJLJ Financial received $37,500 and $30,000 from Regent Financial in June 2014 and November 2013, respectively;

     vi.   JJLJ Financial paid $65,000 to Regent Financial in May 2013;

    vii.   JJLJ Financial paid $35,000 to Daniel Wheeler in May 2013.

h.   According to Boddie and Associates' bank records, Damon received $80,000 through IGWT Consulting in 2012 for the fraudulent letters of credit.

i.   According to Busch's escrow records, Cook received $13,400 through Cook Business Services in 2013 for the fraudulent letters of credit.

j.   According to bank records, Ketterman received $92,570.90 in 2014 for the fraudulent letters of credit.

    k.   According to bank records, Wheeler received $35,000 from JJLJ Financial in 2013 for the fraudulent letters of credit.

    l.   According to bank records, Ketterman received $92,570.90 in 2014 for the fraudulent letters of credit.

64.    The RICO Defendants used or invested, directly or indirectly, a part of such income, or the proceeds of such income, in the acquisition of an interest in, or the establishment or operation of the Enterprise.

65.    As a direct and proximate result of the RICO Defendants' pattern of racketeering activities in violation of 18 U.S.C. § 1962(a) by 18 U.S.C. § 1341 (mail fraud) and § 1343 (interstate wire fraud), SCHC, the SCDOI, and the citizens of the State of South Carolina have suffered substantial injuries and damages.

66.    SCHC is entitled to actual and consequential damages in an amount in excess of Fifteen Million Dollars ($15,000,000), which damages should be trebled pursuant to 18 U.S.C. § 1964 and is entitled to costs and attorneys' fees incurred in bringing this action.

67.    Defendants' liability to the Plaintiff for damages described herein is joint and several.[3] Following, though not every RICO Defendant may have been directly involved in the planning or design of act, nor involved in each and every decision made by Enterprise, each RICO Defendant is, however, liable for the substantive RICO violations of the others. By each Defendant's conscience participation in the performance

---

[3] *See Fleishchhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989) (joint and several liability appropriate for civil RICO violations); *United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) (stating that "[e]very circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations" and summarizing cases).

of the acts with scienter, that are related to, and foster, the operation or management of the enterprise, that each is civilly and criminally liable for the acts of the others.[4]

## FOR A SECOND CAUSE OF ACTION
### (18 U.S.C. § 1962(c))

68.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

69.    18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

70.    The RICO Defendants were groups of persons and their related entities associated in fact for the common purpose of selling fraudulent letters of credit and conducting fraudulent schemes as described herein, including the sale of two LOCs with face values of five million dollars ($5,000,000) and three million dollars ($3,000,000).

71.    The RICO Defendants were each employed by and/or associated with the Enterprise as detailed herein. The RICO Defendants each conducted and/or participated in the Enterprise's affairs through a pattern of racketeering. The pattern of racketeering activity consisted of mail and/or wire fraud in violation of those predicate crimes outlined above under 18 U.S.C. §§ 1341 and 1343. Specifically, the RICO Defendants engaged in an intentional scheme to defraud innocent victims through the sale of fraudulent letters of credit and to obtain money through false and/or fraudulent pretenses, representations and promises. It was reasonably foreseeable to each RICO Defendant that the mails and/or

---

[4] *See, e.g., United States v. Oreato*, 37 F.3d 739, 752 (1st Cir. 1994) (finding that Congress intended to reach all who participated in the conduct of the enterprise, whether they were "generals or foot soldiers").

wires would be used in furtherance of the scheme, and the mails and/or wires were in fact used to further and execute the scheme to defraud.

72.     To execute the scheme to defraud, the RICO Defendants regularly transmitted or caused to be transmitted by means of wire communication in interstate or foreign commerce, writings and/or regularly caused matters and things to be sent via US Mail, as set forth above.

73.     The wire transfers and other predicate crimes listed above each constitute a predicate act of wire fraud because each wire transfer furthered and executed the scheme to defraud the innocent victims, including SCHC.

74.     As a direct and proximate result of the RICO Defendants' pattern of racketeering activities in violation of 18 U.S.C. §§ 1962 (a) by 18 U.S.C. § 1341 (mail fraud) and § 1343 (interstate wire fraud), SCHC, the SCDOI, and the citizens of the State of South Carolina have suffered substantial injuries and damages.

75.     SCHC is entitled to actual and consequential damages in an amount in excess of Fifteen Million Dollars ($15,000,000), which damages should be trebled pursuant to 18 U.S.C. § 1964 and is entitled to costs and attorneys' fees incurred in bringing this action.

86.     Defendants' liability to the Plaintiff for damages described herein is joint and several.[5] Following, though not every RICO Defendant may have been directly involved in the planning or design of act, nor involved in each and every decision made by Enterprise, each RICO Defendant is, however, liable for the substantive RICO

---

[5] *See Fleischhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989) (joint and several liability appropriate for civil RICO violations); *United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) (stating that "[e]very circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations" and summarizing cases).

violations of the others. By each Defendant's conscience participation in the performance of the acts with scienter, that are related to, and foster, the operation or management of the enterprise, that each is civilly and criminally liable for the acts of the others.[6]

### FOR A THIRD CAUSE OF ACTION
### (Conspiracy to Violate RICO
### Violation of 18 U.S.C. § 1962(d) against All Defendants)

76.     Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

77.     From as early as 2011 through 2014, the RICO Defendants unlawfully, knowingly, and willfully combined, conspired and agreed together and with others to violate 18 U.S.C. § 1962 (a) and (c) as described above, in violation of 18 U.S.C. § 1962(d).

78.     The Enterprise was engaged in and/or affected interstate commerce, within the meaning of 18 U.S.C. § 1962(a), (c), and (d).

79.     Through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1)(b) and (5), these defendants, individually and through their respective corporate entities, conspired to violate 18 U.S.C. § 1962 (a) and/or (c), in one or more of the following manners:

        a.  Multiple instances of mail fraud in violation of 18 U.S.C. § 1341 as set forth above; and

        b.  Multiple instances of wire fraud in violation of 18 U.S.C. § 1343 as set forth above;

---

[6] *See, e.g., United States v. Oreato*, 37 F.3d 739, 752 (1st Cir. 1994) (finding that Congress intended to reach all who participated in the conduct of the enterprise, whether they were "generals or foot soldiers").

80.     The RICO Defendants knew they were engaged in a conspiracy to commit the predicate acts as part of the racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

81.     Each RICO Defendant knew about and agreed to facilitate the RICO Enterprise's scheme to defraud SCHC and other innocent victims through the sale of fraudulent LOCs. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the enterprise, including the acts of racketeering set forth above.

82.     As a direct and proximate result of the RICO Defendants' conspiracy and the corresponding racketeering activity, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), SCHC, the SCDOI, and the citizens of the State of South Carolina have suffered substantial injuries and damages.

83.     SCHC is entitled to actual and consequential damages in an amount in excess of Fifteen Million Dollars ($15,000,000), which damages should be trebled pursuant to 18 U.S.C. § 1964 and is entitled to costs and attorneys' fees incurred in bringing this action.

84.     Defendants' liability to the Plaintiff for damages described herein is joint and several.[7] Following, though not every RICO Defendant may have been directly involved in the planning or design of act, nor involved in each and every decision made

---

[7] *See Fleishchhauer v. Feltner*, 879 F.2d 1290, 1301 (6th Cir. 1989) (joint and several liability appropriate for civil RICO violations); *United States v. Philip Morris USA*, 316 F. Supp. 2d 19, 27 (D.D.C. 2004) (stating that "[e]very circuit in the country that has addressed the issue has concluded that the nature of both civil and criminal RICO offenses requires imposition of joint and several liability because all defendants participate in the enterprise responsible for the RICO violations" and summarizing cases).

by Enterprise, each RICO Defendant is, however, liable for the substantive RICO violations of the others. By each Defendant's conscience participation in the performance of the acts with scienter, that are related to, and foster, the operation or management of the enterprise, that each is civilly and criminally liable for the acts of the others.[8]

### FOR A FOURTH CAUSE OF ACTION
**(Fraudulent Misrepresentation against Ciuffo and Williams)**

85.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

86.    Defendants, jointly and severally, committed fraud upon the Plaintiff, and such fraud was intended to induce Plaintiff into purchasing fraudulent LOCs. In committing the fraud, the Defendants:

  a.  Made material false representations of fact and knowingly omitted material information regarding the sale of the LOCs;

  b.  During the course of conduct described herein, Defendants Ciuffo and Williams falsely represented to SCHC that IGM and its affiliate, Protégé Investments, would provide legitimate LOCs in exchange for considerable brokerage fees. Their representations were nothing but a sham to further the scheme to defraud SCHC out of millions of dollars for their own, and the other defendants, personal financial gain;

  c.  Defendants knew their representations were false and said representations were material to SCHC's decision to enter into business transactions with them. Simply put, SCHC would not have

---

[8] *See, e.g., United States v. Oreato*, 37 F.3d 739, 752 (1st Cir. 1994) (finding that Congress intended to reach all who participated in the conduct of the enterprise, whether they were "generals or foot soldiers").

agreed to pay millions of dollars in brokerage fees had it known the LOCs were fraudulent;

d.  Defendants made these representations in total disregard of their truth or falsity and with the specific intent SCHC rely and act upon said representations;

e.  SCHC reasonably relied on the representations made by the Defendants. Simply put, SCHC would not have entered into these transactions but for the misrepresentations relating to the LOCs.

87.    As a result of becoming aware of the fraudulent and intentional acts and omission of Defendants, Plaintiff wrote letters to each Defendant demanding a return of the fees paid for the fraudulent letters of credit via certified mail. The Defendants refused to honor the requests. *See* Exhibit 17.

88.    As a direct and proximate result of Defendants' fraudulent conduct, SCHC suffered substantial injuries and damages. As a result of the foregoing, the Defendants are jointly and severally liable to the Plaintiff for actual damages in an amount to be determined at trial, as well as punitive damages, costs, pre and post-judgment interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

### FOR A FIFTH CAUSE OF ACTION
**(Civil Conspiracy against All Defendants)**

89.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

90.    Between 2011 and 2014, Defendants combined and conspired for the purpose of taking concerted actions to achieve its conspiratorial objective to defraud SCHC out of millions of dollars in brokerage fees in exchange for fraudulent LOCs.

91.    Defendants collectively had an agreement and understanding with regard to these objectives and the manner in which they were to be achieved.

92.    Defendants engaged in these and other acts and joined the conspiracy so they could receive payment in the form of illicit funds from the fraudulent transactions. Defendants concealed the conspiracy from the Plaintiff, financial institutions, the public, and law enforcement, and otherwise avoided any public disclosure of the conspiracy.

93.    SCHC relied on the misrepresentations of co-conspirators Ciuffo and Williams to its detriment, which caused substantial damages and injuries to SCHC, the SCDOI, and the citizens of the State of South Carolina.

94.    Defendants committed unlawful, overt acts in furtherance of the conspiracy, which resulted in injury to SCHC, the SCDOI, and the citizens of the State of South Carolina.

95.    Defendants combined and conspired to cause special damages to Plaintiff both in the form of lost business reputation, the ultimate collapse and insolvency of SCHC, but also in the form of attorneys' fees and costs incurred by SCHC and the State of South Carolina arising out of the SCDOI placing SCHC into rehabilitation.

96.    As a result of the foregoing, the Defendants are jointly and severally liable to the Plaintiff for actual damages in an amount to be determined at trial, as well as punitive damages, costs, pre and post-judgment interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

## FOR A SIXTH CAUSE OF ACTION
### (Conversion against All Defendants)

97.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

98.    Defendants jointly facilitated the conversion of millions of dollars from SCHC through fraud and deceit, by engaging in a scheme to defraud wherein SCHC paid considerable fees in exchange for the fraudulent LOCs.

99.    Defendants willfully, intentionally, and wrongfully converted the monies belonging to SCHC to their own use and for their pecuniary and other persona benefit.

100.    Defendants wrongfully exercised dominion and control over SCHC's monies without permission, knowledge, or consent of the Plaintiff, and said monies was actually used by these Defendants, and resulted in benefits to them without compensation to the Plaintiff.

101.    Defendants took the funds from SCHC with the intention to permanently deprive SCHC, the lawful owner, of its funds. Defendants further refused to return SCHC's funds after receiving demand letters from SCHC. A copy of the demand letters are attached hereto as Exhibit 17 and incorporated herein.

102.    As a direct and proximate result of Defendants' actions, SCHC, the SCDOI, and the citizens of South Carolina have suffered substantial damages and injuries.

103.    By reason of the willful and intentional conversion of Plaintiff's property by Defendants as described above, Plaintiff has suffered and continues to suffer damages including, but not limited to, financial loss, damages to its reputation, and other loss as an

actual, direct and proximate cause of, and resulting from, the aforementioned acts and omissions of the above-captioned Defendants.

104.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff for actual damages in an amount to be determined at trial, as well as punitive damages, costs, pre- and post-judgments interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

### FOR A SEVENTH CAUSE OF ACTION
### (Unjust Enrichment against All Defendants)

105.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

106.    Defendants have been unjustly enriched through their fraudulent scheme to defraud SCHC out of millions of dollars. Defendants received income derived from the sale of the fraudulent LOCs, which was thereafter taken for personal use and utilized to continue the operations of the Enterprise.

107.    It would be inequitable for Defendants to retain the benefits of their fraudulent acts without paying the value thereof to SCHC.

108.    No other remedy at law can adequately compensate SCHC for the damages by the Defendants' scheme to defraud SCHC out of millions of dollars in brokerage fees in exchange for fraudulent LOCs.

109.    The money paid by SCHC should be disgorged and returned to SCHC to prevent unjust enrichment to the Defendants.

110.    As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiff for actual damages in an amount to be determined at trial, as well as punitive

damages, costs, pre- and post-judgments interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

## FOR AN EIGTH CAUSE OF ACTION
**(South Carolina Unfair Trade Practices Act against All Defendants)**

111.    Plaintiff re-alleges each and every allegation set forth above, and hereby incorporates same by reference, as if all were set forth fully herein.

112.    Section 39-5-20 of the *South Carolina Code* prohibits any unfair or deceptive trade practices in the conduct of any trade or commerce. That section further provides that any person suffering an ascertainable loss of money or property as a result of the use by another person of an unfair or deceptive method, act or practice may bring an action individually to recover damages.

113.    The Defendants have engaged in unfair and deceptive acts or practices in the conduct of trade or commerce which include, without limitation,

       a.  Defendants misrepresented and advertised to the public, including consumers in South Carolina—namely, SCHC and the SCDOI—that they sold legitimate LOCs;

       b.  Defendants sold LOCs purportedly from the Bank of America to citizens of the State of South Carolina, which turned out to be fraudulent;

114.    Defendants' misrepresentations were done with the intent to deceive its consumers into thinking the LOCs provided were legitimate in order to generate income for the individual Defendants personal use;

115.    The acts of the Defendants directly or indirectly affect the people of South Carolina and impact the public interest considering, among other things, SCHC insured nearly 4,000 South Carolinians.

116.    The acts of the Defendants have the potential for repetition considering, among other things, Defendants have committed similar schemes to defraud in, among other places, New York, Alabama, Texas and California.

117.    The Defendants' acts constitute a willing and knowing violation of S.C. Code Ann. § 39-5-10 *et seq.*

118.    As a direct and proximate result of the Defendants' violation of S.C. Code Ann. § 39-5-10 *et seq.*, Plaintiff has been damaged and is entitled to recover actual damages, treble damages, and reasonable attorneys' fees for such injuries

119.    Defendants' conduct as alleged herein constitutes violations of South Carolina's Unfair Trade Practices Act for which the Defendants are jointly liable to the Plaintiff. Plaintiff is entitled to recover from Defendants actual damages in an amount to be determined at trial, as well as treble damages, punitive damages, costs, pre- and post-judgments interest, attorneys' fees, and such other additional and further relief, at law or in equity, that the court deems just and proper.

## PRAYER FOR RELIEF

Plaintiff demands judgement against each Defendant jointly and severally for actual and consequential damages, costs, attorneys' fees, pre- and post-judgment interest, treble damages, as well as punitive damages against each individual Defendant on each count; and such other relief as this Court should find to be just and proper.

[*signature block on following page*]

47

YOUNG CLEMENT RIVERS, LLP


By: _____
Michael A. Molony          Federal I.D. # 3953
        Email: mmolony@ycrlaw.com
Jeffrey J. Wiseman          Federal I.D. # 9586
        Email: jwiseman@ycrlaw.com
T. Douglas Concannon     Federal I.D. # 6128
        Email: dconcannon@ycrlaw.com
Mary S. Willis              Federal I.D. # 12388
        Email: mwillis@ycrlaw.com
25 Calhoun Street, Suite 400
Charleston, South Carolina  29401
*Attorneys for the Plaintiff*


Charleston, South Carolina

Dated: _____